# ATTORNEY GENERAL OF TEXAS

## GREG ABBOTT

December 20, 2004

Mr. R. Dyke Rogers, Chairman
Texas Racing Commission
Post Office Box 12080
Austin, Texas 78711-2080

Opinion No. GA-0286

Re: Whether the Texas Racing Commission may grant a license for a racetrack without a formal certification of election results to the Secretary of State; and whether the Commission may initiate a license application process for a county following a formal election certification that occurs more than ten days after the canvass of returns   (RQ-0258-GA)

Dear Mr. Rogers:

The Texas Racing Act (the "Act") sets forth the provisions governing pari-mutuel wagering in Texas. *See* TEX. REV. CIV. STAT. ANN. art. 179e (Vernon Supp. 2004-05). The Texas Racing Commission (the "Commission") may grant racetrack licenses to applicants from counties whose voters have voted to legalize pari-mutuel wagering, and where the county has certified the election results to the Secretary of State within ten days. *See id.* art. 179e, §§ 16.01(a), .12(a). You inquire about the Commission's authority to accept and consider a license application "for a racetrack in a county which passed the local option election before the license application was filed if the only record of timely election results certification to the Secretary of State that can now be found is the County's submission of the election results for the two propositions."[1] You also inquire about the Commission's authority to "initiate a license application process for a county following a formal certification that occurs more than 10 days after the canvass of returns." Request Letter, *supra* note 1, at 2.

## I.   Background

By way of background, you state that your questions are prompted by the unusual situations facing the Commission with respect to Webb and Hidalgo counties. *See id.* at 1.

### A.   Webb County

You inform us that Webb County conducted a local option election in November 2000 in which voters approved two pari-mutuel propositions. *See id.* You indicate that at some point following the November 14, 2000 canvass of the election by the commissioners court, the

---

[1] Letter from R. Dyke Rogers, Chairman, Texas Racing Commission, to Honorable Greg Abbott, Texas Attorney General, at 2 (Aug. 17, 2004) (on file with the Opinion Committee, *also available at* http://www.oag.state.tx.us) [hereinafter Request Letter].

Webb County election precinct returns were filed in the County's election register and sent to the Secretary of State. *See id.* at 3. You presume that because the Webb County precinct returns for November 2000 included the results of contested races, the precinct returns must have been filed with the Secretary of State soon after the election. *See id.* You also inform us that the Commission, aware of the election results, accepted two class II[2] applications for horse racetrack licenses in Webb County. *See id.* at 1, 3. According to your letter, in June 2004 after the Commission had received the license applications from Webb County, the Webb County Interim Elections Administrator signed an affidavit certifying the November 2000 election results. *See id.* at 3, Exhibit D.

### B.      Hidalgo County

With respect to Hidalgo County, you inform us that Hidalgo County voters passed a pari-mutuel proposition at the November 3, 1987 general election. *See id.* at 3. The Hidalgo County election results were certified to the Secretary of State on August 12, 2004, which date is outside the ten-day period provided for in the Act. *See id.* at 3, Exhibit E. You add that on August 12, 2004 the Commission voted to open an application period, commencing on April 1, 2005, to accept class II racetrack license applications from Hidalgo County. *See id.* at 1.

As we discuss below, the ultimate determination of whether the Commission may accept or act on a particular license application from Webb or Hidalgo County depends largely upon the facts and is beyond the scope of an attorney general opinion. *See* Tex. Att'y Gen. Op. No. GA-0139 (2004) at 5.

## II.     Legal Principles

### A.      The Texas Racing Act

The Act prohibits the Commission from issuing a racetrack license or accepting an application for a license for a racetrack in a county "until the commissioners court has certified to the secretary of state that the qualified voters of the county have approved the legalization of pari-mutuel wagering on horse races or greyhound races in the county at an election held under this article." TEX. REV. CIV. STAT. ANN. art. 179e, § 16.01(a) (Vernon Supp. 2004-05). The local option election may be initiated by the commissioners court or on petition of registered voters. *See id.* § 16.02. The election is to be conducted, and the election returns prepared and canvassed, as provided by the Texas Election Code. *See id.* § 16.11(a). The Act specifies the exact ballot language to be submitted to the voters of the county.[3] *See id.* § 16.11(b). Where the majority of the voters are

---

[2]Here, we use the roman numeral nomenclature used in your letter. The Act, however, uses arabic numerals. A class 2 racetrack "is a racetrack on which live racing is conducted for a number of days to be determined by the commission . . . . A class 2 racetrack is entitled to conduct 60 days of live racing in a calendar year." TEX. REV. CIV. STAT. ANN. art. 179e, § 6.02(c) (Vernon Supp. 2004-05). By contrast, a class 1 racetrack is only permitted in certain populous counties, *see id.* § 6.02(b), a class 3 racetrack may only be operated by a county or nonprofit fair for not more than 16 days, *see id.* § 6.02(d), and a class 4 racetrack is operated no more than five days by a county fair. *See id.* § 6.02(g).

[3]Currently, the Act provides language for three ballot propositions: "Legalizing pari-mutuel wagering on horse races in _____ County," "Legalizing pari-mutuel wagering on greyhound races in _____ County," or "Authorizing
(continued...)

in favor of pari-mutuel wagering in the county, the "commissioners court shall certify that fact to the secretary of state not later than the 10th day after the date of the canvass of the [election] returns," *id.* § 16.12(a), but the Act does not provide any particular form or procedure for a commissioners court to use. The Act provides that no "other [pari-mutuel] election may be held in the county . . . until five years have elapsed since the date of the preceding election." *Id.* § 16.12(b).

## B.    Texas Election Law Principles

Because the Act calls for a local option election, it is appropriate to review fundamental principles underlying the right to vote. "The right to free exercise of intelligent choice by a citizen at the polls is surely one of the most treasured of all American heritages guaranteed by the Constitution and Bill of Rights." *Wooley v. Sterrett*, 387 S.W.2d 734, 738 (Tex. Civ. App.–Dallas 1965, no writ). The "free exercise of this right [should not] be unreasonably curtailed or restricted by judicial decree which places a narrow or strict construction on legislative rules." *Id.*; *see also Thomas v. Groebl*, 212 S.W.2d 625, 630 (Tex. 1948) ("[S]tatutes regulating the right to vote should be given a liberal interpretation in favor of that right."). Thus,

> irregularities of the officers in the conduct and return of the election as have not prevented the electors from a free and fair exercise of the right to suffrage, and from having their votes fairly estimated for the candidate [or proposition] of their choice, and which the law has not declared shall set aside their ballots, must be treated as informalities not vitiating the election.

*Orth v. Benavides*, 125 S.W.2d 1081, 1084 (Tex. Civ. App.–San Antonio 1939, writ dism'd). Accordingly, statutory enactments concerning elections must be liberally construed in order to ascertain and effectuate the will of the voters. *Groebl*, 212 S.W.2d at 630.

Statutes regulating the manner of holding an election, even though mandatory in form, are ordinarily given a directory construction, and a departure from their provisions will not invalidate an election unless such departure affects or changes the result of the election. *Honts v. Shaw*, 975 S.W.2d 816, 821 (Tex. App.–Austin 1998, no pet.) (combining election precincts); *Hill v. Smithville Indep. Sch. Dist.*, 251 S.W. 209, 210 (Tex. Comm'n App. 1923, judgm't adopted) (examining procedural irregularities in school tax election); *Groebl*, 212 S.W.2d at 630 (renewing poll tax exemption certificates); *Deffebach v. Chapel Hill Indep. Sch. Dist.*, 650 S.W.2d 510, 512 (Tex. App.–Tyler 1938, no writ) (irregularities in conduct of bond election); *Little v. Alto Indep. Sch. Dist. of Alto, Cherokee County*, 513 S.W.2d 886, 891 (Tex. Civ. App.–Tyler 1974, writ dism'd) (bond election); *Orth*, 125 S.W.2d at 1084 ("Electors must not be deprived of their votes on account of any technical objection to the manner in which the election has been held, or for any misconduct on the

---

[3](...continued)
pari-mutuel wagering on simulcast races in _____ County." TEX. REV. CIV. STAT. ANN. art. § 16.11(b) (Vernon Supp. 2004-05). Prior to its amendment by the Seventy-fifth Legislature to allow for pari-mutuel wagering on simulcast races, the Act included only the first two ballot propositions. *See* Texas Racing Act, 75th Leg., R.S., ch. 1275, § 46, 1997 Tex. Gen. Laws 4840, 4867. We presume for purposes of this opinion that the Hidalgo County ballot included the pre-amendment language pertaining to horse racing. *See* Request Letter, *supra* note 1, at Exhibit E (Hidalgo County Canvass Report for 1987 Constitutional Amendment and Referendum Election, containing proposition for "Local Option–Horse Racing").

part of the presiding officers, if these have not affected the true result of the election."). This principle also applies to statutes regulating elections that are found outside of the Election Code. *See Ferrell v. Harris County Fresh Water Supply Dist. No. 23*, 241 S.W.2d 242 (Tex. Civ. App.–Galveston 1951, no writ) (bond election pursuant to provisions of the Texas Water Code); *Pollard v. Snodgrass*, 203 S.W.2d 641 (Tex. Civ. App.–Amarillo 1947, writ dism'd) (local option election pursuant to provisions of the Texas Alcoholic Beverage Code).

Where a statute is directory, substantial compliance with its provisions is sufficient. *See generally Waters v. Gunn*, 218 S.W.2d 235, 237 (Tex. Civ. App.–Amarillo 1949, writ ref'd n.r.e.) (stating that irregularities in compliance with statutory provisions concerning conduct of election will not invalidate election unless shown to have affected or changed result); *Turner v. Lewie*, 201 S.W.2d 86, 89 (Tex. Civ. App.–Fort Worth 1947, writ dism'd). Substantial compliance does not mean literal and exact compliance with every requirement of a statute, but simply compliance with the essential requirements of the statute. *See* Tex. Att'y Gen. Op. No. JC-0255 (2000) at 4 ("'Substantial compliance' means one has performed the 'essential requirements' of a statute."). "A deviation from the requirements of a statute which does not seriously hinder the legislature's purpose in imposing the requirement is 'substantial compliance.'" *Harris County Appraisal Dist. v. Bradford Realty, Ltd.*, 919 S.W.2d 131, 135 (Tex. App.–Houston [14th Dist] 1994, no writ) (examining substantial compliance in context of Tax Code provisions pertaining to taxpayer challenges).

## III. Legal Analysis

With respect to Webb County, you state that the Commission asks whether Webb County's timely submission of its precinct returns would satisfy the certification requirement of section 16.01(a). *See* Request Letter, *supra* note 1, at 3. If not, you wish to know whether the lack of formal certification in November 2000 precludes the Commission from moving forward on the pending applications from Webb County. *See id.* at 3. If our opinion is that the Commission is so precluded, you inquire whether the Commission may reinitiate the application process based on the formal certification that occurred in June 2004. Your question related to Hidalgo County is whether the Commission may accept and act on applications from a county where certification occurs more than ten days after the canvass of the election. We consider sections 16.01(a) and 16.12(a) as we formulate the answer to these questions.

### A. Section 16.01(a)

Section 16.01(a) is framed in mandatory terms: the "commission *shall not* issue a racetrack license or accept an application for a license . . . *until* the commissioners court has certified to the secretary of state that the qualified voters of the county have approved the [pari-mutuel propositions]." Tex. Rev. Civ. Stat. Ann. art. 179e, § 16.01(a) (Vernon Supp. 2004-05) (emphasis added). With regard to the mandatory term "shall," the Texas Supreme Court stated:

> There is no absolute test by which it may be determined whether a statutory provision is mandatory or directory. The fundamental rule is to ascertain and give effect to the legislative intent. . . .

> [C]onsideration should be given to the entire act, its nature and object, and the consequences that would follow from each construction.

*Chisholm v. Bewley Mills*, 287 S.W.2d 943, 945 (Tex. 1956). A strong indicator of a mandatory construction is the use of negative, prohibitionary, or exclusionary words. *See Gomez v. Timon*, 128 S.W. 656, 657 (Tex. 1910). Where statutory restrictions are couched in negative terms they are usually held to be mandatory. *See id.*

In our review of the Act, we note that section 3.021(a) gives the Commission broad power to "license and regulate all aspects of greyhound racing and horse racing in this state." TEX. REV. CIV. STAT. ANN. art. 179e, § 3.021(a) (Vernon Supp. 2004-05). However, article 16 of the Act makes the exercise of that authority contingent on the outcome of a local option election. Section 16.01(a) further restricts the Commission by limiting the exercise of its authority until certification is made to the Secretary of State that the voters of a particular county approved pari-mutuel wagering in the county. *Id.* § 16.01(a). Considering that article 16 generally, and section 16.01(a) in particular, are restrictions upon the Commission's authority, we conclude that section 16.01(a) is mandatory. Certification of pari-mutuel election results must be made to the Secretary of State *before* the Commission can accept or act on a license application. As previously stated, the Act provides no particular form or procedure by which this certification must be made. Since no direction is given to the Commission from the Act or the Election Code as to what constitutes certification, we determine that the Commission has discretion, subject to judicial review, to decide whether the jurisdictional certification requirement is met by any given action or document (such as the submission of election precinct returns) that precedes the filing of an application with the Commission.

## B.    Section 16.12(a)

Reaching the conclusion that section 16.01(a) is mandatory, we must address your questions pertaining to section 16.12(a). Section 16.12(a) states that where a "majority of the votes cast in the election are for the legalization of pari-mutuel wagering . . . the commissioners court shall certify that fact to the secretary of state not later than the 10th day after the date of the canvass of the returns." *Id.* § 16.12(a). In construing a statute, the legislature directs that, where possible, the statute be construed so that every part is effective. *See* TEX. GOV'T CODE ANN. § 311.021(2) (Vernon 1998). A court must attempt to construe a statute as a whole, harmonizing the statute in its entirety. *Helena Chem. Co. v. Wilkins*, 47 S.W.3d 486, 493 (Tex. 2001) ("[W]e must always consider the statute as a whole rather than its isolated provisions."). We cannot construe section 16.12(a) in isolation, but must consider other sections of article 16. Section 16.12 is contained in article 16 of the Act and sets out the requirements for the conduct of pari-mutuel local option elections. Article 16 provides for initiating the election,[4] ordering the election,[5] determining

---

[4]TEX. REV. CIV. STAT. ANN. art. 179e, §§ 16.02-.09 (Vernon Supp. 2004-05).

[5]*Id.* § 16.10.

the results of and contesting the election,[6] and rescinding the election.[7] Additionally, article 16 incorporates certain provisions of the Texas Election Code. *See* TEX. REV. CIV. STAT. ANN. art. 179e, § 16.11(a) (Vernon Supp. 2004-05). With the exception of section 16.01, every section in article 16 relates to the conduct of a local option election. Section 16.12(a) is a "statutory enactment concerning elections." As such, its provisions are subject to the general rule that statutes regulating the right to vote are directory absent a negative effect on the outcome of the election. *See Smithville Indep. Sch. Dist.*, 251 S.W. at 210; Tex. Att'y Gen. Op. No. JM-467 (1986) at 3.

Moreover, section 16.12(a) is not the type of election-related provision usually given a mandatory construction. Mandatory provisions generally have been limited to "those provisions requiring an election to be held by ballot, setting the day and place where the election is to be held, and prescribing qualifications and eligibility requirements." *Branaum v. Patrick*, 643 S.W.2d 745, 750 (Tex. Civ. App.–San Antonio 1982, no writ). By contrast, section 16.12(a) is merely a reporting requirement directing that the commissioners court timely inform the Secretary of State of the results of the election.

Section 16.12(a) has two distinct components: a certification component and a timing component. Each component merits further discussion.

First, we note here that the certification component of section 16.12(a) is different from the certification requirement of section 16.01(a). Section 16.01(a) focuses on the jurisdictional prerequisite to the Commission's exercise of authority over license applications. By contrast, the certification component of section 16.12(a) relates to the election procedure of the applicable county.

The certification component requires a commissioners court to certify the results of an election to the Secretary of State. However, article 16 does not contain any particular form or language for this certification. Article 16 contains no requirement that certification specifically be made of precinct returns or canvass reports. Instead, section 16.12(a) requires certification that "a majority of the votes cast . . . are for the legalization of pari-mutuel wagering . . . in the county." TEX. REV. CIV. STAT. ANN. art. 179e, § 16.12(a) (Vernon Supp. 2004-05). The emphasis is the accurate reporting of the results of the election to the state's election officer. Once the canvass of precinct returns is complete, the results of the election are determined. Departure from strict compliance with certification to the Secretary of State does not affect or change the outcome of the election.

Section 16.11(a) of the Act requires that election returns be prepared and canvassed "in conformity with the Election Code." *Id.* § 16.11(a). However, the Election Code does not provide direction on how to certify an election. Under section 67.007, the county clerk is directed to prepare the county election returns, *see* TEX. ELEC. CODE ANN. § 67.007(a) (Vernon 2003), and sign the returns to "certify" their accuracy. *See id.* § 67.007(c). Additionally, section 67.007 requires the clerk to deliver within 24 hours "to the Secretary of State . . . the county returns in a sealed

---

[6]*Id.* §§ 16.12-.17.

[7]*Id.* § 16.18.

envelope. The envelope shall be labeled: 'Election Returns for _____ (name) County, for _____(election).'" *Id.* § 67.007(d). Where a county has an elections administrator, he or she must have a seal "on which shall be inscribed a star with five points surrounded by the words 'County Elections Administrator, _____ County, Texas' for use in certifying documents." *Id.* § 31.041. Apart from these few directives, the Election Code does not provide county clerks, or election administrators, with any precise language, or form, by which election returns are to be formally "certified." Certifying the results of an election is a ministerial act. *See Williamson v. Kempf*, 574 S.W.2d 845, 847 (Tex. Civ. App.–Texarkana 1978, writ ref'd n.r.e.). Without formal certification requirements in the Act or the Election Code, a mandatory construction of the ministerial certification requirement that would essentially nullify the wishes of the voters is a harsh result contrary to the policy of protecting a citizen's fundamental right to vote. For these reasons, we conclude that the certification requirement of section 16.12(a) is directory.

The timing component of section 16.12(a) requires the commissioners court to certify the election results to the Secretary of State within ten days after the canvass of the election. TEX. REV. CIV. STAT. ANN. art. 179e, § 16.12(a) (Vernon Supp. 2004-05). While the time period is specific, we believe it is nonetheless directory. *See Lewis v. Jacksonville Bldg. & Loan Ass'n*, 540 S.W.2d 307, 310 (Tex. 1976) ("If the provision directed doing of a thing in a certain time without any negative words restraining it afterwards, the provision as to time is usually directory."). Where the majority of voters in a county favor the pari-mutuel propositions, allowing a technical defect in the ministerial act of certification within the specified time period would deprive the Commission of authority to accept or act on a license application, thwart the wishes of the voters, and render the election meaningless. Texas courts have consistently stated that "[e]lectors must not be deprived of their votes on account of any technical objection to the manner in which the election has been held, . . . if these have not affected the true result of the election." *Orth*, 125 S.W.2d at 1084. A mandatory construction of the timing component of section 16.12(a) would serve to defeat the will of the voters. Accordingly, we conclude that the timing component of section 16.12(a) is directory.

## C.     Substantial Compliance

Our conclusion that section 16.12(a) is directory does not fully dispose of your questions. The question remains as to whether Webb County or Hidalgo County substantially complied with the timing and certification requirements of section 16.12(a). Substantial compliance is performance of the essential requirements of a statute. *See Harris County Appraisal Dist.*, 919 S.W.2d at 135; Tex. Att'y Gen. Op. No. JC-0255 (2000) at 4. We believe the essential requirement of section 16.12(a) is the prompt and accurate determination of whether a majority of the voters are in favor of the pari-mutuel wagering proposition.

Determination of substantial compliance is a question of fact beyond the scope of an attorney general opinion. *Common Cause v. Metro. Transit Auth.*, 666 S.W.2d 610, 613 (Tex. Civ. App.–Houston [1st Dist.] 1984, writ ref'd n.r.e.) (framing question of substantial compliance as a fact issue). *See also* Tex. Att'y Gen. Op. No. GA-0003 (2002) at 1 (stating that opinion process does not determine facts); Tex. Att'y Gen. Op. No. JC-0282 (2000) at 4 ("Whether a governing body has substantially complied . . . is generally a fact question."). This office cannot determine whether Webb County or Hidalgo County substantially complied with section 16.12(a). Accordingly, we leave that question to be resolved by the Commission.

## S U M M A R Y

As a restriction on the Texas Racing Commission's authority, section 16.01(a) of the Texas Racing Act is mandatory. Certification of local option election results must be made to the Secretary of State before the Texas Racing Commission may accept or act on a license application. The Texas Racing Commission has the discretion to determine whether a given action or document preceding a license application constitutes certification under section 16.01(a).

Section 16.12(a) is a statutory enactment concerning elections and, absent a showing that departure from the requirement changes the result of the election, ordinarily should be given a directory construction. Both the certification component and the timing component of section 16.12(a) are directory and require only substantial compliance. Questions of substantial compliance are fact questions outside the scope of the opinion process. Accordingly, this office cannot determine whether Webb County or Hidalgo County substantially complied with section 16.12(a), but leave that determination to the Commission.

Very truly yours,

GREG ABBOTT
Attorney General of Texas

BARRY R. MCBEE
First Assistant Attorney General

DON R. WILLETT
Deputy Attorney General for Legal Counsel

NANCY S. FULLER
Chair, Opinion Committee

Charlotte M. Harper
Assistant Attorney General, Opinion Committee